# EXHIBIT 2

Docusign Envelope ID: D35A89D2-8542-4253-839C-855D5C3683C2

CHAD GREESON (SBN 251928)
LITTLER MENDELSON P.C.
Treat Towers, Suite 600
1255 Treat Boulevard
Walnut Creek, CA 94597
Telephone: (925) 932-2468
Email: cgreeson@littler.com

Attorneys for Defendant
T-MOBILE USA, INC.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN DIAZ, an individual, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>T-MOBILE USA, INC., a corporation, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:25-cv-02933-CSK<br><br>[*Removed from Sacramento Superior Court, Case No. 25cv019618*]<br><br>**DECLARATION OF AFTAB IBRAHIM IN SUPPORT OF DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION**<br><br>[28 U.S.C. §§ 1332, 1441 & 1446] |

Docusign Envelope ID: D35A89D2-8542-4253-839C-855D5C3683C2

I, Aftab Ibrahim, do hereby swear, affirm and attest as follows:

1. I am over the age of eighteen and have personal knowledge of the facts set forth herein or have knowledge of these facts based on my review of business records created and maintained in the ordinary course of business at T-Mobile USA, Incorporated ("T-Mobile"). If called upon as a witness, I could and would testify competently to these facts.

2. I am the Senior Director of Stock Compensation & Executive Programs for T-Mobile and have held this position since June 14, 2020. I have been employed with the company in various positions since May 2010. I was employed in the Senior Director position when Plaintiff, Ryan Diaz, accepted his 2024 Restricted Stock Units ("RSUs"), and I have knowledge of T-Mobile's RSU program, among other T-Mobile incentive and benefits programs. As part of my duties, I have access to business records, data, and other information relating to Mr. Diaz's employment with T-Mobile, including his RSUs. These records are maintained in the ordinary course and scope of business at or around the time of the acts, conditions, events and transactions, from information transmitted by persons who are responsible for making and maintaining such records.

3. I also have direct knowledge of the process by which T-Mobile employees are granted access to, and can access, the Fidelity website portal called NetBenefits. T-Mobile uses NetBenefits to allow employees to access certain incentives and benefits, including RSU offers and the Mutual Agreement to Arbitrate. I also have knowledge of how the Mutual Agreement to Arbitrate was presented to current T-Mobile's employees; how the agreements are reviewed by employees; and agreed to or declined by employees; and the contents of the arbitration agreement itself.

4. T-Mobile offers employees a variety of benefits and awards, including annual stock grants. Annual stock grants, in the form of RSUs, are awarded to nearly all employees each year so that they can share in the Company's financial success. RSUs become shares of T-Mobile stock after a waiting period, so long as the individual stays employed and/or certain other conditions are met. T-Mobile maintains an account used for the RSU grant

Docusign Envelope ID: D35A89D2-8542-4253-839C-855D5C3683C2

for each employee through NetBenefits. Employees log into the site using a self-chosen username and password established through the registration process. To create an account, username and password, the employee has to provide his/her/their first and last name, the last four digits of his/her/their social security number, and his/her/their date of birth. The unique, self-chosen password created cannot be shared or overwritten by anyone at T-Mobile.

5.   If an employee has a grant to accept, the employee could navigate in NetBenefits to the grant offer page using an "Alert" banner at the top of the page. The Alert banner informs the employee that he/she/they has an RSU Award to accept. An employee could also view the grant using a "Quick Link" on the NetBenefits landing screen that contains the Alert banner. If an employee has a grant to accept, the grant offer page lists RSU Awards that an employee could accept or decline, including those available beginning February 25, 2024. Employees could then click to review the "Grant Agreement," "Plan Document," and "Mutual Agreement to Arbitrate" as separate PDF documents on the page accessed via the Alert banner or Quick Link page. Employees could take as much time as needed to review these documents.

6.   On February 25, 2024, Mutual Agreement to Arbitrate and RSU Awards became available to eligible employees on NetBenefits. On March 1, 2024, Mr. Diaz accessed his NetBenefits account using his self-created username and password. On the same day, at 12:58 P.M. EST, Mr. Diaz clicked "Accept your award", located on the grant offer page, and accepted his grant of seven RSUs, along with the Mutual Agreement to Arbitrate. The accepted Mutual Agreement to Arbitrate is located in Mr. Diaz's Fidelity file, where he has access to it at all times, along with other grant documents. Attached hereto as **Exhibit A** is a true and correct copy of Mr. Diaz's Mutual Agreement to Arbitrate, accepted on March 1, 2024. Attached as **Exhibit B** is a true and correct copy of Mr. Diaz's RSU Grant Notice, accepted on March 1, 2024.

7.   As part of Mr. Diaz's acceptance of the RSU and his subsequent Agreement to arbitrate, Mr. Diaz received 7 RSU shares. Mr. Diaz received two separate vesting

1  payments consistent with the terms set forth in his 2024 RSU Agreement: (i) $198.58 on
2  August 25, 2024; and (ii) $541.08 on February 25, 2025.
3      8.    Mr. Diaz was hired by T-Mobile on January 27, 2023, and his employment
4  was terminated on June 24, 2025.
5      9.    T-Mobile's business activities regularly and consistently involve and affect
6  interstate commerce. T-Mobile does business in multiple states and advertises its business
7  on the internet and through other interstate mechanisms.
8
9      I declare under penalty of perjury under the laws of the United States and the State
10 of California that the foregoing is true and correct.
11     Executed this __17__ day of December 2025 in Bellevue, Washington.



Aftab Ibrahim

4   CASE NO. *25-cv-02933-CSK*
DECLARATION OF AFTAB IBRAHIM IN SUPPORT OF DEFENDANT'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

# EXHIBIT A



# MUTUAL AGREEMENT TO ARBITRATE

**This Mutual Agreement to Arbitrate is a contract and covers important issues relating to your rights. It is your sole responsibility to read it and understand it. You are free to seek assistance from independent advisors of your choice outside the Company if you wish.**

This Mutual Agreement to Arbitrate ("Agreement") is between Employee (also referred to as "You") and T-Mobile ("T-Mobile" or "Company"). For purposes of this Agreement, any reference to T-Mobile or Company includes any T-Mobile-related company or entity that You have applied for employment with and/or that employs or has employed You at any time, including, without limitation, T-Mobile USA, Inc. The Federal Arbitration Act ("FAA") (9 U.S.C. § 1 et seq.) applies to and governs this Agreement. All disputes covered by this Agreement will be decided by a single arbitrator through final and binding arbitration **and not by court or jury trial**.

**1)    COVERED CLAIMS**:  This Agreement is intended to be as broad as legally permissible, and, except as expressly excluded in Section 2 below, applies to all claims or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration, including, without limitation, claims or disputes arising out of or related to Employee's application and selection for employment, employment, and/or termination of employment. Except as expressly excluded in Section 2 below, this Agreement applies to any claims or disputes that T-Mobile may have against You or that You may have against T-Mobile, and/or any of its past, present, or future:

- officers, directors, members, owners, shareholders, or employees,
- parents, subsidiaries, or affiliates,
- benefit plans or equity/phantom equity plans, or the plans' sponsors, fiduciaries, administrators, affiliates, or agents,
- predecessors, successors, or assigns,

(each and all of whom/which may enforce this Agreement as a direct or third-party beneficiary).

Except as expressly excluded in Section 2 below, this Agreement applies, without limitation, to claims based on or related to discrimination, harassment, retaliation, defamation (including post-employment defamation or retaliation), breach of a contract or covenant, Grant Agreements, Restricted Stock Unit Awards, Incentive Award Plans (but nothing herein shall be construed to reduce or eliminate the deference to the Plan Administrator that would otherwise be required prior to, or as part of a claim in court, procedurally or substantively), privacy, fraud, negligence, breach of fiduciary duty, trade secrets, unfair competition, wages, minimum wage and overtime or other compensation or any monies claimed to be owed, meal breaks and rest periods, termination, tort claims, common law claims, equitable claims, and claims arising under the Defend Trade Secrets Act, Fair Credit Reporting Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Pregnancy Discrimination Act, Pregnant Workers Fairness Act, Equal Pay Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and (a) covered by the Employee Retirement Income Security Act of 1974 or (b) funded by insurance), Affordable Care Act, Genetic Information Non-Discrimination Act, Uniformed Services Employment and Reemployment Rights Act, Worker Adjustment and Retraining Notification Act, Older Workers Benefits Protection Act of 1990, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, False Claims Act, state statutes or regulations addressing the same or similar subject matters, and any and all claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance relating to employment.

The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the scope, interpretation, applicability, enforceability, or waiver of this Agreement. However, the preceding sentence does not apply to any claims under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, and it does not apply to the "Class and Collective Action Waiver" and/or "California PAGA Individual Action Requirement", each as further described below. Notwithstanding any other clause or language in this Agreement and/or any rules or procedures that might otherwise apply because of this Agreement (including, without limitation, the American Arbitration Association Rules discussed below) or any amendments and/or modifications to those rules, any disputes about the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act and/or any claim that all or any portion of the Class and Collective Action Waiver and/or California PAGA Individual Action Requirement is unenforceable, inapplicable, unconscionable, or void or voidable, will be determined only by a court of competent jurisdiction and not by an arbitrator.

2) **CLAIMS NOT COVERED BY THIS AGREEMENT AND LIMITATIONS ON HOW THIS AGREEMENT APPLIES**:  These claims are not covered under this Agreement: (i) claims for workers' compensation benefits, state disability insurance, and unemployment insurance benefits, but this Agreement does apply to discrimination or retaliation claims based upon seeking such benefits; (ii) disputes that an applicable federal statute expressly states cannot be arbitrated or subject to a pre-dispute arbitration agreement; (iii) claims that are not subject to a pre-dispute arbitration agreement as provided by the Sarbanes Oxley Act, 18 U.S.C. § 1514; and (iv) disputes that may not be subject to a pre-dispute arbitration agreement under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (at Employee's election). Claims brought in small claims court, or Your state's equivalent court, are also not covered by this Agreement so long as such claims are brought only in that court. If any such claim is transferred or appealed to a different court, either party may require arbitration, and the conduct of any party during the small claims or equivalent proceeding shall not be a ground for waiver of the right to arbitrate. If any claim(s) not covered under this Agreement are combined with claims that are covered under this Agreement, to the maximum extent permitted under applicable law, the covered claims will be arbitrated and continue to be covered under this Agreement.

Notwithstanding any contrary language in this Agreement, this Agreement also does not apply to any claims or disputes arising out of any consumer transaction between You and the Company, including without limitation, any disputes over Terms and Conditions that You may be party to in connection with any employee and/or family wireless service and/or other consumer transaction. And notwithstanding any contrary language in this Agreement, this Agreement does not apply to any employee if they are already party to an arbitration agreement in an Offer of Employment Letter and/or Amended and Restated Employment Agreement, and such Offer of Employment Letter and/or Amended and Restated Employment Agreement shall remain effective and any disputes between T-Mobile and said employee will be resolved in accordance with the arbitration agreement in those agreements. Also notwithstanding any contrary language in this Agreement, if (and only if) You are a Vice-President or higher employed primarily outside California, this Agreement does not apply to any Restrictive Covenant, Intellectual Property Ownership and Assignment, and Confidentiality Agreement or similar agreement ("RCA") between You and the Company; either party may enforce the RCA according to its terms.

Both the Company and You may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy ("Provisional Relief"), but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such relief or where the relief is sought in order to secure performance of an agreement designed to prevent irreparable harm. The court to which the application is made is authorized to consider the merits of the arbitrable controversy for the limited purposes of evaluating the elements of probable success and possibility of irreparable injury to the extent required and applicable for the issuance of Provisional Relief under controlling law. All determinations of final relief will be decided in arbitration, and the pursuit of Provisional Relief shall not be deemed incompatible with or constitute a waiver of rights under this Agreement.

Nothing in this Agreement prevents You from making a report to or filing a claim or charge with a governmental agency, including, without limitation, the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities and Exchange Commission, National Labor Relations Board, Occupational Safety and Health Administration, Office of Federal Contract Compliance Programs, or law enforcement agencies, and nothing in this Agreement prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Agreement. This Agreement also does not prevent federal administrative agencies from adjudicating claims and awarding remedies, even if the claims would otherwise be covered by this Agreement. Nothing in this Agreement prevents or excuses a party from satisfying any conditions precedent and/or exhausting administrative remedies under applicable law before bringing a claim in arbitration. T-Mobile will not retaliate against You for filing a claim with an administrative agency or for exercising rights (individually or in concert with others) under the National Labor Relations Act. This Agreement also does not prevent or prohibit You in any way from reporting, communicating about, or disclosing claims for discrimination, harassment, retaliation, or sexual abuse.

Further Exclusion. This Agreement does not apply to any claims in any pending class and/or collective action and/or California Private Attorneys General Act lawsuit filed in court before the date of Your first receipt (including electronically via Fidelity) of this Agreement of which You are a member or putative member or an aggrieved party (as that term is defined by the California Private Attorneys General Act) as of the date of Your first receipt of this Agreement ("Pending Claims"); provided, however, if the Pending Claims are covered by a prior or existing agreement to arbitrate, that agreement will remain in full force and effect as to those claims and will continue to apply to the Pending Claims ("Pending Claims Exception"). In all other respects, this Agreement will apply, including, without limitation, if the Pending Claims are dismissed and refiled and/or to any amended or additional claims added to the Pending Claims.

3) **ARBITRATION PROCEDURES**:  The parties will select the neutral Arbitrator by mutual agreement, who shall make disclosures to both parties. If the parties cannot mutually agree to an Arbitrator, the arbitration will be administered by the American Arbitration Association ("AAA"), and except as provided in this Agreement, will be under the then current Employment Arbitration Rules of the AAA ("AAA Rules") (the AAA Rules are available via the internet at www.adr.org/employment or by using a service such as Google to search for "AAA Employment Arbitration Rules"); provided however, that if there is a conflict between the AAA Rules and this Agreement, this Agreement shall govern. Unless the parties jointly agree otherwise, the Arbitrator must be a retired judge from any jurisdiction. Unless the parties jointly agree otherwise, the arbitration will take place in or near the city in which Employee is or was last employed by T-Mobile.

**Mutual Agreement to Arbitrate**                                                                                         Page 2 of 5

In the event the parties do not mutually choose an arbitrator, the Arbitrator will be selected as follows: AAA will give each party a list of 11 arbitrators (subject to the qualifications listed above) drawn from its panel of arbitrators. Each party will have 10 calendar days to strike all names on the list it considers unacceptable. If only one common name remains on the lists of all parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the party initiating the claim to strike first, until only one remains. If no common name remains on the lists of all parties, the AAA will furnish another list of 11 arbitrators from which the parties will strike alternately by telephone conference administered by AAA, with the party initiating the claim to strike first, until only one name remains. That person will be designated as the Arbitrator. If for any reason, the individual selected cannot serve, AAA will issue another list of 11 arbitrators, and the parties will repeat the alternate striking selection process. The AAA is without authority to unilaterally appoint an arbitrator. If AAA will not administer the arbitration or will not administer the arbitration consistent with this Agreement, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted to appoint a neutral arbitrator, who shall act under this Agreement with the same force and effect as if he or she had been specifically named herein.

The Arbitrator may award any remedy to which a party is entitled under applicable law, but remedies will be limited to those that would be available to a party in their individual capacity for the claims presented to the Arbitrator, and no remedies that otherwise would be available to an individual under applicable law will be forfeited. The Arbitrator must apply the substantive federal, state, or local law applicable to the claims asserted. Either party may file dispositive motions, including, without limitation, a motion to dismiss and/or a motion for summary judgment and the Arbitrator will apply the standards governing such motions under the Federal Rules of Civil Procedure. A party may make an offer of judgment in a manner consistent with, and within the time limitations, consequences, and effects provided in, Rule 68 of the Federal Rules of Civil Procedure. To the extent allowed by applicable law as determined by the Arbitrator and if the claim(s) or counterclaim(s) brought by either party in arbitration allow for imposition of sanctions, the Arbitrator may award either party its reasonable attorneys' fees and costs, including reasonable expenses associated with production of witnesses or proof, upon a finding that the claim or counterclaim was frivolous or brought solely to harass You or the Company.

The Arbitrator will issue an award by written opinion within 30 days from the date the arbitration hearing concludes, or the post-hearing briefs (if requested) are received, whichever is later. The opinion will be in writing and include the factual and legal basis for the award. Either party may petition a court of competent jurisdiction to confirm, enforce, correct, or vacate the Arbitrator's opinion and award.

**4)     CLASS AND COLLECTIVE ACTION WAIVER**:  You and the Company agree to bring any claim on an individual basis only. Accordingly, YOU AND THE COMPANY WAIVE ANY RIGHT FOR ANY DISPUTE TO BE BROUGHT, HEARD, DECIDED, OR ARBITRATED AS A CLASS ACTION AND/OR COLLECTIVE ACTION AND THE ARBITRATOR WILL HAVE NO AUTHORITY TO HEAR OR PRESIDE OVER ANY CLASS AND/OR COLLECTIVE ACTION ("Class and Collective Action Waiver"). Additionally, no arbitration proceeding under this Agreement may be consolidated or joined in any way with an arbitration proceeding involving claims by different employees. The Class and Collective Action Waiver will be severable from this Agreement if there is a final judicial determination that the Class and Collective Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such case, the class and/or collective action must be litigated in a civil court of competent jurisdiction—not in arbitration—but any portion of the Class and Collective Action Waiver that is enforceable shall be enforced in arbitration.

**5)     CALIFORNIA PRIVATE ATTORNEYS GENERAL ACT ("PAGA") INDIVIDUAL ACTION REQUIREMENT**:  You and the Company agree to arbitrate PAGA claims on an individual basis only. Therefore, any claim by You under PAGA to recover for unpaid wages, civil penalties, or other individual relief must be arbitrated under this Agreement. The Company and You also agree that You will not pursue any non-individual PAGA claims in court (and such claims shall be stayed in the trial court) until after the Arbitrator makes a final determination as to Your status as "aggrieved," and, then, only if the determination is that You were "aggrieved"; the Arbitrator, and not any Court, will determine Your alleged status as "an aggrieved employee." The Arbitrator is without authority to preside over any PAGA claim by You on behalf of any other person or joined by or consolidated with another person's or entity's PAGA claim. This California PAGA Individual Action Requirement clause will be severable from this Agreement if there is a final judicial determination that it is invalid, unenforceable, unconscionable, void or voidable. In such case, the PAGA action must be litigated in a civil court of competent jurisdiction—not in arbitration—but any portion of the California PAGA Individual Action Requirement that is enforceable will be enforced in arbitration.

**6)     NOTICE, COOLING OFF PERIOD, AND INFORMAL SETTLEMENT CONFERENCE**:  You and the Company agree that the party initiating the claim must make a written Demand for Arbitration of the claim to the other party by the expiration of the statute of limitations (deadline for filing) that the law requires for the claim. The Demand for Arbitration must be signed by the party making the Demand for Arbitration (by You personally or an authorized representative of T-Mobile). The Demand for Arbitration must identify the claim(s) asserted, the facts on which such claims are based, and the relief and/or remedy sought. A written Demand for Arbitration to T-Mobile must be sent to T-Mobile's Legal Department at employmentarbitration@t-mobile.com. You will be given notice of any Demand for Arbitration by T-Mobile at Your last home address in T-Mobile's personnel files. The Arbitrator will resolve all disputes about the timeliness or propriety of the Demand for Arbitration and apply the statute of limitations that would have applied if the claim(s) had been brought in court.

The parties mutually agree that after a party initiates the claim by making a written Demand for Arbitration there will be a 30 day "Cooling Off Period". During the Cooling Off Period, the parties may attempt to resolve the claim. The parties may also mutually agree to extend the Cooling Off Period. During the Cooling Off Period, either party may request an informal meeting to discuss a potential informal resolution of the dispute, without the need to go forward in an arbitration ("Informal Settlement Conference"). If timely requested, the Informal Settlement Conference will take place at a mutually agreeable time by telephone or videoconference. You and a Company representative must both personally participate; any counsel representing You or T-Mobile also may participate. The requirement of personal participation in an Informal Settlement Conference may be waived only if both You and T-Mobile agree in writing. The purpose of the Cooling Off Period and Informal Settlement Conference is to allow the parties to attempt resolution. At the end of the Cooling Off Period or, if an Informal Settlement Conference is timely requested, 30 days after completion of the Informal Settlement Conference, and unless the parties have resolved the claim, the parties will begin the Arbitrator selection process as described herein. Unless otherwise prohibited by applicable law, an arbitrator and/or AAA is without authority to accept or administer any arbitration demand, or assess or demand fees for the arbitration, unless and until the parties have complied with the Demand for Arbitration process and Cooling Off Period, and Informal Settlement Conference, if request by either party.

**7)    DISCOVERY AND SUBPOENAS**:  Each party may take the deposition of 3 individual fact witnesses and any expert witness designated by another party. Each party may also propound requests for production of documents and 5 interrogatories, and each party may subpoena witnesses and documents for discovery or the arbitration hearing, including testimony and documents relevant to the case from third parties, in accordance with any applicable state or federal law. Additional discovery may be conducted by mutual stipulation, and the Arbitrator will have exclusive authority to entertain requests for additional discovery, and to grant or deny such requests, based on the Arbitrator's determination whether additional discovery is warranted by the circumstances of a particular case.

**8)    ARBITRATION FEES AND COSTS**:  The Company will pay all costs and expenses unique to arbitration, including, without limitation, the Arbitrator's fees, except for the filing fee (if any) as required by the mutually selected Arbitrator or AAA Rules (if the parties do not mutually select the Arbitrator), but You will not be responsible for any portion of those fees in excess of the filing or initial appearance fees applicable to court actions in the jurisdiction where the arbitration will be conducted. The Company will pay any remaining portion of the fee. Any party may be represented by an attorney selected by the party. Unless the parties agree to any extension of time for the payment due date, the parties must pay their respective required fees or costs within 60 days of the date that the Arbitrator or AAA, if applicable, issues the invoice to the parties. Each party will pay for its own costs and attorneys' fees, if any. However, if any party prevails on a claim which affords the prevailing party attorneys' fees or costs, or if there is a written agreement providing for fees or costs, the Arbitrator may award reasonable fees and/or costs to the prevailing party as provided by law. The Arbitrator will resolve any disputes about costs/fees associated with arbitration.

**9)    ADMINISTRATION OF MASS ARBITRATION DEMANDS PROCEDURES ("MAD PROCEDURES")**:  If 50 or more claimants submit Demands for Arbitration or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. You agree to this process even though it may delay the arbitration of Your claim. In the first stage, claimants' counsel and T-Mobile will each select up to 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators, subject to the Arbitrator selection process and qualifications in this Agreement (with the exception, however, that the arbitrators may also be attorneys experienced in the subject matter of the disputes and not just retired judges). If there are 50 or fewer cases, all will be filed in arbitration. In the meantime, no other cases may be filed or proceed in arbitration, and AAA (if the parties do not mutually select the arbitrators) cannot assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the first stage is completed, the parties must engage in a single mediation (with the parties to mutually select a mediator and if not possible, the mediator to be selected under the AAA Rules) of all remaining cases, and T-Mobile will pay the mediation fee. If the parties cannot agree how to resolve the remaining cases after mediation, they will repeat the process of selecting and filing 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, provided, however, (1) a total of 100 cases may be filed in the third and later stages, (2) those cases will be randomly selected, (3) arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available, and (4) mediation is optional at the election of counsel for the claimants.

If these MAD Procedures apply, any timely Demand for Arbitration will be tolled until the demand is selected for a staged proceeding, withdrawn, or otherwise resolved. If either party raises exigent circumstances, such as a health emergency or loss of a critical witness, as to why a particular claim should be substituted for one of the staged proceedings that the parties initially select (or as selected randomly if after the second stage), the parties agree to meet and confer in good faith to select a substitute staged process. A court will have the authority to

enforce these MAD Procedures, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of arbitrator's fees. This MAD Procedures Section and each of its requirements are intended to be severable from the rest of this Agreement. If there is a final judicial determination that the staging process in this subsection is unenforceable, then the cases may be filed in arbitration and the payment of any applicable filing, administration, case-management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed pursuant to the selection process in this Agreement rather than when the arbitrations are initiated.

**10)   CONSTRUCTION**:  This Agreement applies to employees whose primary workplace and/or home base is the United States of America and its territories. Subject to the clauses entitled "Class and Collective Action Waiver" and "California PAGA Individual Action Requirement" above (which include their own severability provisions), if any provision of this Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Agreement. All remaining provisions will remain in effect. The mutual obligations by the Company and You to arbitrate provide consideration for this Agreement. Your eligibility and/or receipt of a grant of restricted stock units is additional consideration for this Agreement. If the FAA does not apply to a particular dispute or to one or both parties, the parties stipulate that the Delaware Uniform Arbitration Act ("DUAA") will apply and the parties acknowledge that one or more T-Mobile entities are incorporated in Delaware. If neither the FAA nor DUAA apply, the arbitration law of the jurisdiction where the arbitration will take place will apply. This Agreement does not alter the "at-will" status of Your employment.

**11)   ENTIRE AGREEMENT**:  This is the complete agreement of the parties about arbitration of claims and disputes covered by this Agreement. No contractual disclaimers the Company has in any handbooks, other agreements, or policies precludes the enforceability of this Agreement. Subject to the Pending Claims Exception above, and/or unless this Agreement is not entered into or deemed void, unenforceable, or invalid, this Agreement supersedes and replaces any other agreements regarding arbitration of disputes covered by this Agreement. But this Agreement is separate and distinct from any binding arbitration agreement included in any consumer Terms and Conditions ("Consumer Arbitration Agreement") that You may be party to in connection with any employee and/or family wireless service and/or other consumer transaction with T-Mobile. The Consumer Arbitration Agreement shall remain in effect and operate according to its terms as to claims covered in the Consumer Arbitration Agreement, but this Agreement will apply in all other respects and both agreements shall be interpreted consistently with one another. You and the Company expressly agree that this Agreement supersedes and takes priority over any provision, if any, in any RCA between You and T-Mobile that requires a contrary forum or venue from this Agreement for any claim or dispute covered by this Agreement, irrespective of when You enter(ed) into such RCA. Notwithstanding the forgoing, claims for Provisional Relief (as defined in Section 2 above) under the RCA may be pursued in a court of law under the terms of this Agreement, and may be pursued in the venue and forum provided for in the RCA with respect to such provisional, non-final relief. In all other respects, any applicable RCA will remain in full effect and will operate according to the terms thereof. This Agreement will survive the termination of Employee's employment and the expiration of any benefit.

**EMPLOYEE ACCEPTS AND AGREES TO THIS AGREEMENT THROUGH AN ELECTRONIC ACCEPTANCE PROCESS ON A SEPARATE SCREEN. ACCORDINGLY, EMPLOYEE'S NAME, SIGNATURE, AND DATE WILL <u>NOT</u> APPEAR ON THIS AGREEMENT.**

_Deeanne King_
_____
**Signature Of Authorized Company Rep.**

**EVP & Chief People Officer**
**Title of Representative**

```
O8D7HN32
03/01/2024 12:58 PM U.S. Eastern Standard Time
ACCEPTED
```

# EXHIBIT B

<div style="border:1px solid black; padding:10px;">

**T-MOBILE US, INC.**

**2023 INCENTIVE AWARD PLAN**

</div>

**RESTRICTED STOCK UNIT GRANT NOTICE**

**(TIME-VESTING, BROAD-BASED – ANNUAL AWARD)**

T-Mobile US, Inc., a Delaware corporation (the "***Company***"), has granted to the participant listed below ("***Participant***") the Restricted Stock Units (the "***RSUs***") described in this Restricted Stock Unit Grant Notice (this "***Grant Notice***"), subject to the terms and conditions of the T-Mobile US, Inc. 2023 Incentive Award Plan (as amended from time to time, the "***Plan***") and the Restricted Stock Unit Agreement attached hereto as **Exhibit A** (the "***Agreement***"), both of which are incorporated into this Grant Notice by reference. Capitalized terms not specifically defined in this Grant Notice or the Agreement have the meanings given to them in the Plan.

| | |
|---|---|
| **Participant:** | **RYAN   NIERENHAUSEN** |
| **Grant Date:** | **02/25/2024** |
| **Number of RSUs:** | **7** |

**Vesting Schedule:**

(a) One-fourth (1/4th) of the RSUs granted hereby shall vest on each of the six-month, twelve-month, eighteen-month and twenty-four month anniversaries of the Grant Date (each, a "***Vesting Date***"), subject to Participant's continued status as a Service Provider through the applicable Vesting Date.

(b) Notwithstanding the foregoing:

(i) If Participant incurs a Termination of Service due to Participant's death or Disability, any then-unvested RSUs shall vest upon such Termination of Service.

(ii) If Participant incurs a Termination of Service as a result of a Workforce Reduction or Divestiture, any then-unvested RSUs otherwise scheduled to become vested upon the next scheduled Vesting Date shall vest upon such Termination of Service; provided, however, that Participant will not be eligible to receive any vesting of the RSUs under this subsection (b)(ii) unless Participant executes and, if applicable, does not revoke all documents required under the applicable Company severance program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by the Company (which, in either case, shall be no later than sixty (60) days following the date of such Termination of Service). In the event Participant fails to execute all required documents in a timely fashion, then if any RSUs have vested or been paid to Participant after the Termination of Service but before Participant's failure to execute all required documents, Participant covenants and agrees that Participant will have no right, title or interest in such amount vested or paid and that Participant will cause such amount to be returned immediately to the Company upon notice.

(iii) Subject to the provisions of Article VIII of the Plan, if (A) a Change in Control is consummated and (B) upon the consummation of the Change in Control or at

any time during the one (1)-year period thereafter, Participant incurs a Termination of Service by the Company or its Affiliates for any reason, then any then-unvested RSUs shall vest as of such Termination of Service.

**Definitions:**   For purposes of this Grant Notice and the Agreement, the following terms shall have the following meanings:

(ii)   "***Divestiture***" means a Termination of Service as the result of a divestiture or sale of a business unit as determined by Participant's employer based on the personnel records of the Company and its Affiliates.

(iii)   "***Workforce Reduction***" means Participant's Termination of Service as a result of a reduction in force, realignment or similar measure as determined by Participant's employer and (i) Participant is officially notified in writing of such Termination of Service due to a workforce reduction and eligibility for the Company's severance program under which Participant is covered, or (ii) if not covered by a Company severance program, Participant is notified in writing by an authorized officer of the Company or any Affiliates that the Termination of Service is as a result of such action.

Participant must accept this Agreement electronically pursuant to the online acceptance procedure established by the Company prior to the first Vesting Date otherwise, the Company may, in its sole discretion, rescind the RSUs in their entirety.  By accepting (whether in writing, electronically or otherwise) the RSUs, Participant agrees to be bound by the terms of this Grant Notice, the Plan and the Agreement.  Participant has reviewed the Plan, this Grant Notice and the Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Grant Notice and fully understands all provisions of the Plan, this Grant Notice and the Agreement.  Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan, this Grant Notice or the Agreement.

## RESTRICTED STOCK UNIT AGREEMENT

Capitalized terms not specifically defined in this Restricted Stock Unit Agreement (this "*Agreement*") have the meanings specified in the Grant Notice or, if not defined in the Grant Notice, in the Plan.

### ARTICLE II.
### GENERAL

2.1     Award of RSUs. The Company has granted the RSUs to Participant effective as of the Grant Date set forth in the Grant Notice (the "*Grant Date*").  Each RSU represents the right to receive one Share, as set forth in this Agreement. Participant will have no right to the distribution of any Shares until the time (if ever) the RSUs have vested.

2.2     Incorporation of Terms of Plan.  The RSUs are subject to the terms and conditions set forth in this Agreement and the Plan, which is incorporated herein by reference.  In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan will control, unless it is expressly specified in this Agreement or the Grant Notice that the specific provision of the Plan will not apply.  For clarity, the foregoing sentence shall not limit the applicability of any additive language contained in this Agreement which provides supplemental or additional terms not inconsistent with the Plan.

2.3     Unsecured Promise.  The RSUs will at all times prior to settlement represent an unsecured Company obligation payable only from the Company's general assets.

### ARTICLE III.
### VESTING; FORFEITURE AND SETTLEMENT

3.1     Vesting; Forfeiture.  The RSUs will vest according to the vesting schedule in the Grant Notice except that any fraction of an RSU that would otherwise be vested will be accumulated and will vest only when a whole RSU has accumulated.  Except as otherwise set forth in the Grant Notice, the Plan or this Agreement, and unless the Administrator otherwise determines, in the event of Participant's Termination of Service for any reason, all unvested RSUs will immediately and automatically be cancelled and forfeited (after taking into consideration any accelerated vesting which may occur in connection with such Termination of Service, if any) and Participant shall have no further right to or interest in such cancelled and forfeited RSUs.

3.2     Settlement.

(a)     RSUs that vest will be paid in Shares as soon as administratively practicable after the vesting of the applicable RSU, but in no event later than the earlier of (i) ninety (90) days following the date on which the applicable RSU vests or (ii) March 15th of the calendar year immediately following the calendar year in which the applicable RSU vests. Notwithstanding the foregoing, if the vesting of an RSU is subject to execution of a release of claims, and such release of claims may be executed and/or revoked in a calendar year following the calendar year in which the payment event occurs, the payment shall be made in the second such calendar year to the extent necessary to comply with Section 409A.

(b)     Notwithstanding the foregoing, the Company may delay any payment under this Agreement that the Company reasonably determines would violate Applicable Law or an applicable provision of the Plan until the earliest date the Company reasonably determines the making of the payment will not cause such a violation (in accordance with Treasury Regulation Section 1.409A-2(b)(7)(ii));

provided, that the Company reasonably believes the delay will not result in the imposition of excise taxes under Section 409A.

## ARTICLE IV.
## TAXATION AND TAX WITHHOLDING

4.1     <u>Representation</u>.  Participant represents to the Company that Participant has reviewed with Participant's own tax advisors the tax consequences of the RSUs and the transactions contemplated by the Grant Notice and this Agreement.  Participant is relying solely on such advisors and not on any statements or representations of the Company or any of its Affiliates or their respective agents.

4.2     <u>Tax Withholding</u>.

(a)     Subject to Section 4.2(b) below and Section 9.5 of the Plan, the Company will have the authority and the right to deduct or withhold, or require Participant to remit to the Company, an amount sufficient to satisfy all federal, state, local and foreign taxes required by Applicable Law to be withheld in connection with the vesting or settlement of the RSUs or any other taxable event related to the RSUs, including, without limitation, the authority to deduct such amounts from other compensation payable to Participant by the Company.

(b)     Unless the Company otherwise determines, the Company shall withhold, or cause to be withheld, in satisfaction of any applicable withholding tax obligations and in accordance with Section 9.5 of the Plan, a number of Shares otherwise issuable upon settlement of the RSUs having a fair market value not exceeding the aggregate amount of such withholding tax liabilities based on the minimum individual statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income.

(c)     Participant acknowledges that Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs, regardless of any action the Company or any Affiliate takes with respect to any tax withholding obligations that arise in connection with the RSUs.  Neither the Company nor any Affiliate makes any representation or undertaking regarding the treatment of any tax withholding in connection with the grant, vesting or payment of the RSUs or the subsequent sale of Shares.  The Company and its Affiliates do not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax liability.

## ARTICLE V.
## OTHER PROVISIONS

5.1     <u>Adjustments</u>.  Participant acknowledges that the RSUs and the Shares subject to the RSUs are subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan.

5.2     <u>Clawback.</u>  The RSUs and the Shares issuable hereunder shall be subject to any clawback or recoupment policy in effect on the Grant Date or as may be adopted or maintained by the Company following the Grant Date, including, without limitation, the Company's Amended and Restated Executive Incentive Compensation Recoupment Policy.

5.3     <u>Notices</u>.  Any notice to be given under the terms of this Agreement to the Company must be in writing and addressed to the Company in care of the Company's Head of Stock Compensation at the Company's principal office or the Head of Stock Compensation's then-current email address or facsimile number.  Any notice to be given under the terms of this Agreement to Participant must be in writing and

addressed to Participant (or, if Participant is then deceased, to the Designated Beneficiary) at Participant's last known mailing address, email address or facsimile number in the Company's personnel files. By a notice given pursuant to this Section, either party may designate a different address for notices to be given to that party. Any notice will be deemed duly given when actually received, when sent by email, when sent by certified mail (return receipt requested) and deposited with postage prepaid in a post office or branch post office regularly maintained by the United States Postal Service, when delivered by a nationally recognized express shipping company or upon receipt of a facsimile transmission confirmation.

5.4     Dispute Resolution Procedure. Any and all claims and disputes regarding and/or arising out of or related to the RSUs, the Grant Notice, the Plan, or this Agreement shall be resolved under any *Mutual Agreement to Arbitrate* or other applicable arbitration agreement ("Arbitration Agreement") between Company and Participant. However, nothing herein shall be construed to reduce or eliminate the deference to the Plan Administrator that would otherwise be required prior to, or as part of a claim in court, procedurally or substantively.

5.5     Venue. If there is no Arbitration Agreement between Company and Participant or such Arbitration Agreement is inapplicable, any legal or equitable action or any proceeding arising directly, indirectly, or otherwise in connection with, out of, related to or from the Grant Notice or this Agreement, or any provision thereof or hereof, shall exclusively be filed and adjudicated in King County, Washington and no other venue.

5.6     Conformity to Securities Laws. Participant acknowledges that the Plan, the Grant Notice and this Agreement are intended to conform to the extent necessary with all Applicable Laws and, to the extent Applicable Laws permit, will be deemed amended as necessary to conform to Applicable Laws.

5.7     Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement will inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in this Agreement or the Plan, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

5.8     Limitations Applicable to Section 16 Persons. Notwithstanding any other provision of the Plan or this Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, the Grant Notice, this Agreement and the RSUs will be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3) that are requirements for the application of such exemptive rule. To the extent Applicable Laws permit, this Agreement will be deemed amended as necessary to conform to such applicable exemptive rule.

5.9     Entire Agreement; Amendment. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof. To the extent permitted by the Plan, the Grant Notice and this Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Administrator or the Board; provided, however, that except as may otherwise be provided by the Plan, no amendment, modification, suspension or termination of this Agreement shall materially and adversely affect the RSUs or without the written consent of Participant.

5.10    Severability. If any portion of the Grant Notice or this Agreement or any action taken under the Grant Notice or this Agreement, in any case is held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Grant Notice and/or this Agreement (as applicable),

and the Grant Notice and/or this Agreement (as applicable) will be construed and enforced as if the illegal or invalid provisions had been excluded, and the illegal or invalid action will be null and void.

5.11  Limitation on Participant's Rights.  Participation in the Plan confers no rights or interests other than as herein provided.  This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and may not be construed as creating a trust.  Neither the Plan nor any underlying program, in and of itself, has any assets.  Participant will have only the rights of a general unsecured creditor of the Company with respect to amounts credited and benefits payable, if any, with respect to the RSUs, and rights no greater than the right to receive cash or the Shares as a general unsecured creditor with respect to the RSUs, as and when settled pursuant to the terms of this Agreement.

5.12  Not a Contract of Employment or Service.  Nothing in the Plan, the Grant Notice or this Agreement confers upon Participant any right to continue in the employ or service of the Company or its Affiliate or interferes with or restricts in any way the rights of the Company and its Affiliates, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without Cause, except to the extent expressly provided otherwise in a written agreement between the Company or an Affiliate and Participant.

5.13  Counterparts.  The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which will be deemed an original and all of which together will constitute one instrument.

5.14  Governing Law.  The Grant Notice and this Agreement will be governed by and interpreted in accordance with the laws of the State of Delaware, disregarding any state's choice-of-law principles requiring the application of a jurisdiction's laws other than the State of Delaware.

5.15  Section 409A.

(a)  This Agreement shall be interpreted in accordance with the requirements of Section 409A. Notwithstanding any provision of this Agreement, the Company may adopt such amendments to this Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to avoid the imposition of taxes under Section 409A, provided, however, that this Section 5.14 shall not create an obligation on the part of the Company to adopt any such amendment, policy or procedure or take any such other action, nor shall the Company have any liability for failing to do so. To the extent that any payment window spans two calendar years, Participant shall have no discretion over or ability to control the actual year in which payment is made.

(b)  Notwithstanding anything to the contrary in this Agreement, no amounts that constitute "non-qualified deferred compensation" (within the meaning of Section 409A) shall be paid to Participant under this Agreement during the six (6)-month period following Participant's "separation from service" to the extent that the Administrator determines that Participant is a "specified employee" (each within the meaning of Section 409A) at the time of such separation from service and that paying such amounts at the time or times indicated in this Agreement would be a prohibited distribution under Section 409A(a)(2)(b)(i). If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of such six (6)-month period (or such earlier date upon which such amount can be paid under Section 409A without being subject to such additional taxes), the Company shall pay to Participant in a lump-sum all amounts that would have otherwise been payable to Participant during such six (6)-month period under this Agreement.

       5.16    <u>Titles</u>.  Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

<div align="center">* * * * *</div>

```
O8D7HN32
03/01/2024 12:58 PM U.S. Eastern Standard Time
ACCEPTED
```