UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RYAN DIAZ, an individual and on behalf of all others similarly situated,

          Plaintiff,

   v.

T-MOBILE USA, INC., a corporation, and DOES 1 through 50, inclusive,

          Defendants.

No. 2:25-cv-02933 WBS CSK

MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS CLASS CLAIMS

----oo0oo----

     "The impelling considerations that led to the Enactment of the Federal Arbitration Act are the advantages of providing a speedier, more economical, and more effective enforcement of rights by way of arbitration than can be had by the tortuous course of litigation."
          Wilko v. Swan, 346 U.S. 427, 439-40 (1953)(Frankfurter, J. dissenting).

     The advantage of arbitration can be no more obvious than it is in cases brought by employees against their employer,

1

where both sides benefit from the savings in time, costs, and emotional energy inherent in the litigation process.  Yet, in this court's recent experience, the plaintiffs in such cases seem to reflexively resist arbitration to the point where the litigation over the enforceability of the arbitration clause in their employment contract becomes more costly and time-consuming than it would be to simply litigate the merits of their dispute. This appears to be another such case.

Plaintiff Ryan Diaz filed this putative class action alleging various California Labor Code violations arising from defendant T-Mobile's purported failure to provide non-discretionary remuneration, sick pay, and accurate rates of pay on wage statements.  (Docket No. 1 at 15.)  Defendant has moved to compel arbitration, to dismiss plaintiff's putative class claims, and to stay the action pending the resolution of individual arbitration.  (Docket No. 18 at 19.)

I.   T-Mobile's Arbitration Agreement

Plaintiff was a T-Mobile employee between 2023 and 2025.  (Docket No. 18 at 4.)  One of the benefits T-Mobile offers its employees is an annual grant of Restricted Stock Units (RSUs), conditioned on acceptance of several agreements. (Declaration of Aftab Ibrahim ("Ibrahim Decl.") Docket No. 18-2) ¶ 4.)

T-Mobile facilitates the grant of RSUs through its website portal NetBenefits, on which employees register with a username and password before navigating to the RSUs' "Grant Documents" page.  (Id. ¶ 5.)  Employees are then shown three documents: a "Grant Agreement," "Plan Document," and "Mutual

2

Agreement to Arbitrate," all of which they are instructed to read before accepting.  (Id.)  The text below the Mutual Agreement to Arbitrate reads, "This Agreement requires final and binding arbitration of claims/disputes arising out of your employment relationship with T-Mobile. PLEASE READ IT CAREFULLY."  (Docket No. 18 at 5 (capitalization in original).)

Below the three documents are two clickable prompts that enable the user to either accept or decline the award of RSUs, along with the following, separate notice:

By clicking "Accept my award," I confirm that I have opened, read, understand, and agree to the documents above, including the Mutual Agreement to Arbitrate. I understand those documents award me certain Restricted Stock Units and require me to resolve certain claims/disputes arising from my employment relationship with T-Mobile individually before an arbitrator, not a court or jury.

(Declaration of Aaron Westlake ("Westlake Decl.") (Docket No. 18-3)

The agreement also contains Mass Arbitration Demand ("MAD") procedures, which are triggered when fifty (50) or more claimants file arbitrations raising similar claims and are represented by the same or coordinated counsel.  (Docket No. 18-2, Ex. A, at 4.)  In such instances, cases are resolved in "staged proceedings," whereby the parties select a batch of cases "to be filed in arbitration and resolved individually" while remaining cases are delayed; arbitrators are instructed to resolve the selected cases within 120 days.  (Id.)

3

After this first stage is complete, a mediator oversees the remaining cases, with T-Mobile paying the mediation fee. (Id.)  If the mediation does not resolve the remaining cases, the staging of fifty individual arbitrations repeats once more; after the second stage, fifty additional claims are allowed, which are randomly selected and for which mediation is optional.  (Id.)

Plaintiff was granted seven RSUs on February 25, 2024. (Ibrahim Decl. ¶ 7.)  Plaintiff does not dispute that he accepted that award through the process just described, but he nonetheless argues that his claims are not subject to individual arbitration because he did not expressly assent to the agreement and because the agreement is unconscionable.  (Docket No. 19.)

When determining whether claims are subject to arbitration, courts typically decide two "gateway questions of arbitrability": "'(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute.'"  Gomez v. T-Mobile USA, Inc., No. 2:24-cv-01468 BJR, 2025 WL 3684175, at *2 (W.D. Wash. Feb. 19, 2025) (citing Brennan v. Opus Bank, 796 F. 3d 1125, 1130 (9th Cir. 2015)).  However, these gateway issues "can be delegated to the arbitrator where the parties have 'clearly and unmistakably' manifested such intent'" through a delegation clause.  Gomez, 2025 WL 3684175 (citing AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)); see also, e.g., Kohler v. Whaleco, Inc., 757 F. Supp. 3d 1112, 1123 (S.D. Cal. 2024) ("[T]he Court considers, as a threshold matter, whether there is clear and unmistakable evidence the parties intended to delegate the arbitrability question to an arbitrator.")

4

Section 1 of T-Mobile's Mutual Agreement to Arbitrate states that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the scope, interpretation, applicability, enforceability, or waiver of this agreement." (Ibrahim Decl. ¶ 1). This language has repeatedly been recognized as "clear and unmistakable evidence that the Parties intended to delegate," Grant v. T-Mobile USA, Inc., No. 2:23-cv-01946 MJP, 2024 WL 3510937, at *6 (W.D. Wash. July 23, 2024) (citing Rent-a-Center, West, Inc. v. Jackson, 561 U.S. 63, 66 (2010)); see also Gomez, 2025 WL 3684175, at *2 (same); Grant, 2024 WL 3510937, at *6 (same).

Where a delegation clause is present, "[f]irst, a court must resolve any challenge that an agreement to arbitrate was never formed." Caremark, LLC v. Chickasaw Nation, 43 F. 4th 1021, 1030 (9th Cir. 2022). If the court determines an agreement was formed, it then "resolve[s] any challenge directed specifically to the enforceability of the delegation clause." Id.

II.  Whether an Agreement to Arbitrate was Formed

Federal courts apply state contract law in determining whether parties have agreed to arbitrate. See Berman v. Freedom Financial Network, LLC, 30 F. 4th 849, 855 (9th Cir. 2022). Under California law -- which the parties agree applies -- an agreement to arbitrate requires that "the parties . . . manifest their mutual assent to the terms of the agreement." Id. In the context of "online agreements," courts consider whether "(1) the website provides reasonably conspicuous notice of the terms to

which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  Id.

Plaintiff argues that he did not assent to the arbitration agreement because it was "deeply embedded within an RSU stock acceptance process" on the NetBenefits website, which "[did] not explicitly discuss the arbitration of employment disputes."  (Docket No. 19 at 6.)

Two district courts have assessed this exact agreement and concluded that "the acceptance screen provided [the employee] with reasonably conspicuous notice of the Agreement's terms," and that "by clicking the button clearly labeled 'Accept your Award,' the [T-Mobile employee] unambiguously manifested her assent to the terms of the Agreement."  Gomez, 2025 WL 3684175, at *3 (citing Grant, 2024 WL 3510937, at *4-5).  The court finds the reasoning in these decisions to be highly persuasive and on point, given that the opposing parties made the same arguments plaintiff makes here regarding mutual assent.  See Grant, 2024 WL 3510937, at *5 ("Grant challenges the formation of the Agreement because it . . . [was] 'buried in reference documents.'"); Gomez, 2025 WL 3684175, at *3 (granting motion to compel where "the only argument regarding whether an agreement was formed" concerned the agreement's embeddedness in "the Employee Stock Grant program").  In reiterating arguments that have already been rejected twice, plaintiff does not even mention -- much less attempt to distinguish -- the analyses or holdings of these prior decisions.

The court sees no reason to diverge from what has already been aptly determined: "[T-Mobile employees] had both

6

reasonably conspicuous notice of the terms of the Agreement and then expressly manifested assent to be bound by those terms," Grant, 2024 WL 3510937, at *5, and therefore concludes that the parties entered into a valid agreement to arbitrate.

Having determined there is a valid agreement, the court must now resolve challenges directed to the delegation clause.

III. Enforceability of the Delegation Clause

"A party may challenge a delegation provision using generally applicable contract defenses, including unconscionability." Taylor v. TA Operating, No. 2:22-cv-0094 WBS DMC, 2023 WL 171359, at *9 (E.D. Cal. Jan. 12, 2023) (internal citations and quotation marks omitted). "Unconscionability has both a 'procedural' and a 'substantive' element." Taylor, 2023 WL 171359, at *3 (citing Armendariz v. Found. Health Psychcare Servs., 24 Cal. 4th 83, 114 (2000)), and "[b]oth [must] be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." Id.

a.   Substantive Unconscionability

"A substantive unconscionability analysis examines the fairness of a contract's terms," and accordingly involves assessing whether there are "terms that are unreasonably favorable to the more powerful party." Taylor v. TA Operating, LLC, No. 2:22-cv-00947 WBS DMC, 2023 WL 171359, at *3 (E.D. Cal. Jan. 12, 2023) (internal citations and quotation marks omitted).

Citing Heckman v. Live Nation Entertainment, Inc., 120 F. 4th 670 (9th Cir. 2024), and Pandolfi v. AviaGames, Inc., No. 23-cv-05971-EMC, 2024 WL 4051754 (N.D. Cal. Sept. 4, 2024), aff'd

7

No. 24-5817, 2025 WL 2463742 (9th Cir. Aug. 27, 2025), plaintiff argues the delegation clause is substantively unconscionable because it "functions as part of" the agreement's MAD procedures. (Docket No. 19 at 18.)

The "arbitration novelties" inherent to mass arbitration provisions such as these have forced numerous courts to wrestle with the question of whether MAD procedures unfairly prejudice claimants whose arbitration demands are not included in what are referred to as "bellwether cases" or "batch proceedings."  Heckman, 120 F. 4th at 692 (VanDyke, J., concurring); see Pandolfi, 2024 WL 4051754; Burkhardt v. Extra Space Management, Inc., No. 2:25-cv-00547 DJC CKD, 2025 WL 2172287 (E.D. Cal. July 31, 2025); Tercero v. Sacramento Logistics LLC, No. 2:24-cv-00953 DC JDP, WL 43125, at *9 (E.D. Cal. Jan. 7, 2025); see also J. Maria Glover, Mass Arbitration, 74 Stan. L. Rev. 1283, 1283 (2022) (describing mass arbitration as "a new and distinct model of dispute resolution" that "recasts long-standing debates in litigation theory and jurisprudence").

Notwithstanding the lack of clear guidance from the Ninth Circuit, however, the court is not convinced that Heckman and Pandolfi are controlling in this case, because the concerns those cases raise about MAD procedures are not present here. Moreover, the holdings in both cases were based in part on a finding of procedural unconscionability.  Pandolfi, 2024 WL 4051754, at *5 (analyzing MAD procedures after finding "some degree of procedural unconscionability"); Heckman, 120 F. 4th at 681 (agreeing with the district court that "the delegation clause is procedurally unconscionable to an extreme degree" (internal

8

citation and quotation marks omitted)).  As explained below, T-Mobile's agreement is not procedurally unconscionable.

The Heckman court discussed three problems with the MAD procedures of the agreement before it: batched cases were chosen unilaterally, were aggregated and handled by a single arbitrator, and their holding was binding on subsequent arbitrations.  See Heckman, 120 F. 4th at 684-85.  The court concluded these procedures "provide to defendants many of the protections and advantages of a class action, but provide to non-bellwether plaintiffs virtually none."  Id.  The Pandolfi court focused on the potential for excessive delay of resolution for non-batched claims, while emphasizing that its analysis "should not be viewed as a general condemnation of case management strategies for mass arbitrations."  2024 WL 4051754, at *6 n.4.

The agreement here does not implicate the problems articulated in Pandolfi and Heckman.  Selection of batched cases is split between parties, the cases proceed on an individual basis with distinct arbitrators, the results of batched cases are not binding on subsequent cases, and the arbitrations are meant to be resolved in 120 days.  MAD procedures with these characteristics have been found enforceable because they facilitate "consolidated arbitration," rather than "class or representative arbitration," and thus preserve claimants' ability to arbitrate "in [their] individual capacity."  Jones v. Starz Entertainment, 129 F. 4th 1176, 1182 (9th Cir. 2025); see also McGrath v. Doordash, Inc., No. 19-cv-05279 EMC, 2020 WL 6526129, at *9-11 (N.D. Cal. Nov. 5, 2020) (enforcing MAD procedures where cases were selected by both parties, initial batches were

resolved in 120 days, and mediation fees were paid by respondent); Tercero, WL 43125, at *9 (E.D. Cal. Jan. 7, 2025) (enforcing MAD procedures where the statute of limitations for non-batched cases was tolled and there was little evidence of significant delay).

Because the MAD procedures in T-Mobile's agreement preserve individual arbitration, do not unfairly prejudice non-batched cases, and do not present significant delay, they do not "contain[] all the red flags associated with classwide arbitration" and are thus not substantively unconscionable. Jones, 129 F. 4th at 1182.

b.   Procedural Unconscionability

As to procedural unconscionability, plaintiff merely recycles his argument that "there was no assent to the arbitration agreement," and concludes from this alone that "the delegation clause lacks clear and unmistakable assent."  (Docket no. 19 at 18-19.)  The court has already considered and rejected plaintiff's mutual assent argument.  See Gomez, 2025 WL 3684175, at *2; Grant, 2024 WL 3510937, at *6.  Absent any further argument or authority provided by plaintiff, the court finds that the delegation clause is not procedurally unconscionable.

IV.  Dismissal of Class Claims

Defendant also moves to dismiss plaintiff's class claims pursuant to the agreement's class action waiver.  Section 4 of the agreement provides that the employee agrees to "waive any right for any dispute to be brought . . . as a class action and/or collective action."  (Ibrahim Decl. Ex. 1, ¶ 4.) Plaintiff has not challenged this provision.

10

The Supreme Court has held that class action waivers in arbitration agreements are enforceable. See Epic Sys. Corp. v. Lewis, 584 U.S. 487, 502-03 (2018) ("Congress has instructed federal courts to enforce arbitration agreements according to their terms – including terms providing for individualized hearings."). Correspondingly, such waivers are routinely upheld by courts in this circuit. See, e.g., Dhaliwal v. Ace Hardware Corp., No. 2:22-cv-0446 DAD KJN, 2023 WL 2555471, at *7-9 (E.D. Cal. Mar. 17, 2023) (finding that "the representative action waiver provision is not unlawful" and dismissing class claims); Steele v. Am. Mortg. Mgmt. Servs., No. 2:12-cv-00085 WBS, 2012 WL 5349511, at *8 (E.D. Cal. Oct. 26, 2012) ("[C]ourts routinely enforce arbitration agreements that deny class relief."); Rubio v. Marriott Resorts Hosp. Corp., No. 8:23-cv-0773 FWS ADS, 2023 WL 8153535, at *3 (C.D. Cal. Oct. 17, 2023) ("Accordingly, the court will enforce the class action waiver and dismiss Plaintiff's class claims.").

The court will accordingly enforce the class action waiver.

V.   Conclusion

In sum, because the court finds that the parties mutually assented to the arbitration agreement, and that the delegation clause and class action waiver are enforceable, IT IS HEREBY ORDERED that defendant's motion to compel arbitration and dismiss class claims (Docket No. 18) be, and the same hereby is, GRANTED, AND IT IS FURTHER ORDERED that this case is STAYED pending arbitration.

The Clerk shall close this file administratively,

subject to it being reopened upon the application of either party after arbitration has been fully completed.

Dated:   February 20, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE